# Third District Court of Appeal

## State of Florida

Opinion filed February 5, 2025.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D21-1987
Lower Tribunal No. 07-99-M
_____

**Rodney Shands, et al.,**
Appellants,

vs.

**City of Marathon,**
Appellee.

An Appeal from the Circuit Court for Monroe County, Mark H. Jones, Judge.

Pacific Legal Foundation, Jeremy Talcott (Sacramento, CA), Robert H. Thomas (Sacramento, CA), Mark Miller, and Kathryn D. Valois (Palm Beach Gardens), for appellants.

Johnson, Anselmo, Murdoch, Burke, Piper & Hochman, PA, and Hudson C. Gill (Fort Lauderdale), for appellee.

Derek V. Howard and Peter H. Morris, Assistant County Attorneys, for Monroe County, Florida, as amicus curiae, and Weiss Serota Helfman Cole & Bierman, P.L. and John J. Quick, for Village of Islamorada, as amicus curiae.

Before LOGUE, C.J., and EMAS, FERNANDEZ, SCALES, LINDSEY, MILLER, GORDO, LOBREE, BOKOR, and GOODEN, JJ.

MILLER, J.

<u>UPON CITY OF MARATHON'S MOTION FOR REHEARING, REHEARING EN BANC, AND CERTIFICATION</u>

We grant rehearing en banc, withdraw the panel opinion in <u>Shands v. City of Marathon</u>, 48 Fla. L. Weekly D907 (Fla. 3d DCA 2023), and substitute the following opinion in its stead.

This inverse condemnation appeal presents a novel issue regarding the role that transferred development rights ("TDRs") occupy in adjudicating a categorical, as-applied regulatory takings claim advanced under the landmark case of <u>Lucas v. South Carolina Coastal Council</u>, 505 U.S. 1003 (1992). Appellants, the children of the late Dr. R.E. Shands, are the owners of Shands Key, a 7.9-acre offshore island in the Florida Keys. Dr. Shands acquired the property in 1956, and at that time, the property was zoned for residential use with an authorized density of one dwelling per acre. Upon the death of Dr. Shands, title to the island passed to his wife. She, in turn, conveyed the property to appellants. In 1986, Monroe County changed Shands Key's zoning status from "General Use" to "Conservation Offshore Island." Thirteen years later, appellee, the City of Marathon, incorporated and adopted Monroe County's regulations. An application to construct a

2

dock for increased island access was denied, and the zoning authority effectively foreclosed any use of the island, other than for beekeeping or personal camping. After unsuccessfully pursuing administrative relief, appellants filed suit, alleging a regulatory taking under Lucas. Protracted litigation and multiple appeals ensued. Appellants then sought partial summary judgment on the basis that the regulation, as applied, deprived them of all economically beneficial use of their property. The City countered the motion with affidavits alleging that TDRs awarded under its Rate of Growth Ordinance ("ROGO") and Building Permit Allocation System ("BPAS")[1] infused the property with some value. These, it argued, considered in tandem with the residual land value derived from a potential future sale, precluded a Lucas claim. After considering the language in two prior decisions rendered by this court, the trial judge concluded that he was constrained to adjudicate the case under the ad hoc, multi-factor test developed in Penn Central Transportation Company v. City of New York, 438

---

[1] The City's "Numerical Allocation Limits" set a total annual allocation of thirty residential building permits. Marathon, Fla., Code § 107.02. Permit applications are allocated "points," which applicants may earn through cash donations and land dedications. Id. § 107.01(B)(1), (F). Some factors, such as high-quality hammock, preclude points. The points function to advance or hinder a pending application. Once the City fulfills the annual allocation, applicants must wait, perhaps indefinitely, for a permit. See id. §§ 107.07(G), 107.08.

U.S. 104 (1978), and further found that disputed issues of fact precluded summary judgment. The primary issue in this appeal is the propriety of that ruling.

I

In 1956, Dr. R.E. Shands purchased an offshore island in the Florida Keys from the federal government at public auction. The island, now known as Shands Key, spanned 7.9 acres and was subject to the jurisdiction of Monroe County, which zoned it "General Use" ("GU"). This designation allowed for the construction of one home per acre on the property.

Dr. Shands received and recorded a federal land patent, which granted fee simple title to the island to him and his heirs "forever." He then purchased seven acres of the surrounding bay bottom from the State of Florida to construct a bridge connecting the island to the mainland.

Dr. Shands never realized his plans, as he died in October 1963. Title to Shands Key and the surrounding bay bottom passed to his wife, who conveyed the property in fee simple to her four adult children twenty-one years later.

In 1979, the Florida Legislature designated the Florida Keys archipelago as an "area of critical state concern" in response to a rise in development. See § 380.0552(1), Fla. Stat. (1979). This designation

4

subjected any enactments, amendments, or rescissions of land development regulations or elements of a local comprehensive plan in the Florida Keys to approval by the state land planning agency. See generally § 380.05, Fla. Stat. (1979); see also § 380.0552(9), Fla. Stat. (1989).

In 1986, Monroe County adopted the Monroe County Comprehensive Plan (the "Plan"), a regulatory land use management system that restricted development in unincorporated areas of the county. See Ch. 163, Fla. Stat. (1986). Consistent with the Plan, the County downzoned Shands Key from GU to "Conservation Offshore Island" and placed it in the future land use category of "conservation" for the stated purpose of preserving natural resources and disincentivizing development.

In 1992, Monroe County adopted its ROGO, a competitive permit allocation system for residential development designed to guide development away from environmentally sensitive areas. It was purposed to ensure resident safety during hurricane evacuation and preserve natural resources.

Seven years later, the City of Marathon incorporated and adopted Monroe County's previous enactments. As a result, Shands Key remained zoned as Conservation Offshore Island and designated in the conservation

future land use category in order "to establish areas that are not connected to U.S. 1 as protected areas."

In 2004, appellants applied for a permit to construct a dock on Shands Key. The City denied the application, informing appellants that their property consisted of "high quality hammock with a mangrove fringe," which was a "suitable habitat for the state listed threatened White Crowned Pigeon." However, the City expressed an interest in acquiring six acres of upland and proposed appellants publicly dedicate their land in exchange for an award of TDRs under the ROGO or BPAS allocation systems.

Appellants declined and, instead, filed a Beneficial Use Determination ("BUD") application. The City's special master concluded that downzoning Shands Key from GU to Conservation Offshore Island "prohibit[ed] any development of [appellants'] property under any circumstances" and left appellants with no reasonable economic use for the island. He recommended the City either issue a building permit for a single-family residence or purchase the property from appellants. The Marathon City Council voted 3-2 to reject the special master's recommendations, and appellants filed suit in the Sixteenth Judicial Circuit in and for Monroe County.

So began nearly two decades of litigation, including two appeals. In the parties' first appeal, this court reversed the trial court's order dismissing

6

the case on statute of limitations grounds.  See Shands v. City of Marathon (Shands I), 999 So. 2d 718, 720 (Fla. 3d DCA 2008).  There, the court determined appellants' challenge was "as applied," rather than "categorical" or "facial,"[2] and therefore not barred by the statute of limitations.  Id. at 725–26.  In support of this characterization, the court reviewed the relevant ordinance and noted that it provided for "low intensity residential uses . . . that [could] be served by cisterns, generators and other self-contained facilities," and "[d]etached residential dwellings."  Id. at 724 (citations omitted).  It further observed that TDRs, including ROGO allocation points, were available.  See id.[3]

On remand, the City successfully moved for summary judgment on the complaint, contending that the availability of TDRs rendered the facts indistinguishable from Beyer v. City of Marathon (Beyer II), 197 So. 3d 563 (Fla. 3d DCA 2013).  This court again reversed on appeal, finding the City failed to establish the value of the TDRs associated with the property.  See

---

[2]  See id. at 722 n.8 ("The word 'facial' is a term of art more properly applied when evaluating the constitutional validity of a statute, regulation or ordinance, as in whether the ordinance is constitutional 'on its face.'  This is a separate analysis from whether the regulation has, by its enactment, effected a 'taking.'  [The Shands I court] use[d] the term 'facial,' however, following the usage made by the parties, but point[ed] out that in this context the term refers to a categorical, per se, taking, as used in Lucas . . . .").

[3]  The affidavit-based submissions outline the availability of allocated points.

Shands v. City of Marathon (Shands II), 261 So. 3d 750, 753 (Fla. 3d DCA 2019).

Following the second remand, appellants moved for partial summary judgment on the basis that they had established a viable categorical, as-applied challenge under Lucas. In support of their motion, appellants submitted sworn testimony establishing that the downzoning from GU to Conservation Offshore Island limited the use of the property to beekeeping and personal camping. This limitation, they argued, rendered the property "economically idle" under Lucas. See 505 U.S. at 1019.

Invoking Shands I and II and other precedent, the City opposed summary judgment on the ground that the potential award of TDRs infused the property with value, thereby precluding a categorical, as-applied taking under Lucas. The City also offered an expert affidavit for the proposition that the property could be sold to a willing buyer for recreational value.

The trial court denied the motion. The case subsequently proceeded to a two-day non-jury trial, at the conclusion of which the court found the case indistinguishable from the Beyer cases—a duology of inverse condemnation appeals from this court involving Bamboo Key, a nine-acre offshore island in unincorporated Monroe County. See generally Beyer v. City of Marathon (Beyer I), 37 So. 3d 932 (Fla. 3d DCA 2010); Beyer II,197 So. 3d 563. In

Beyer I, this court rejected a categorical Lucas takings claim premised on downzoning, stating that "[t]he [p]roperty . . . has additional beneficial economic value because it has transferable development rights." 37 So. 3d at 934 (emphasis removed). By way of a lengthy and well-reasoned order, the trial court then determined appellants failed to establish a taking under the ad hoc, multi-factored analysis set forth in Penn Central. This appeal followed.[4]

## II

Our review is de novo, as it entails the denial of partial summary judgment and resultant claim preclusion. See Shands II, 261 So. 3d at 752. This case was decided under Florida's "old" summary judgment standard. As we explained in Feldman v. Schocket, 366 So. 3d 1104 (Fla. 3d DCA 2022),

> Pursuant to the old standard, summary judgment was proper "if there [was] no genuine issue of material fact and if the moving party [was] entitled to a judgment as a matter of law." In accordance with this test, "the existence of *any* competent evidence creating an issue of fact, however credible or incredible, substantial or trivial, stop[ped] the inquiry and preclude[d] summary judgment, so long as the 'slightest doubt' [was] raised."

---

[4]  As this is an appeal from a final judgment, "the antecedent denial of summary judgment is reviewable." Tiger Point Golf & Country Club v. Hipple, 977 So. 2d 608, 610 (Fla. 1st DCA 2007).

9

Id. at 1107 (alterations and emphasis in original) (first quoting Volusia County v. Aberdeen at Ormond Beach, L.P., 760 So. 2d 126, 130 (Fla. 2000), and then quoting Bruce J. Berman & Peter D. Webster, Berman's Florida Civil Procedure § 1.510:5 (2020 ed.)).

## III

The Takings Clause of the Fifth Amendment, applicable to the states through the Fourteenth Amendment, commands, "[N]or shall private property be taken for public use, without just compensation." Amend. V, U.S. Const.[5] Similarly, the Florida Constitution provides that "[n]o private property shall be taken except for a public purpose and with full compensation therefor paid . . . ." Art. X, § 6(a), Fla. Const.[6] As the Supreme Court has explained,

---

[5] The Takings Clauses of the Fifth Amendment and the Florida Constitution are interpreted coextensively. St. Johns River Water Mgmt. Dist. v. Koontz, 77 So. 3d 1220, 1222 (Fla. 2011), rev'd on other grounds, 570 U.S. 595 (2013).

[6] Florida statutory law further expands protection for private property rights under the "Bert J. Harris, Jr. Private Property Rights Protection Act." See § 70.001(1), Fla. Stat. (2024) ("[A]s a separate and distinct cause of action from the law of takings, the Legislature herein provides for relief, or payment of compensation, when a new law, rule, regulation, or ordinance of the state or a political entity in the state, as applied, unfairly affects real property."); see also City of Jacksonville v. Smith, 159 So. 3d 888, 892 (Fla. 1st DCA 2015) ("The Act 'filled a void in then-existing Florida law because, prior to its enactment, there was no means by which an owner could receive compensation for the adverse financial effects of governmental regulation of his land without satisfying the constitutional standards for a taking, namely, physical invasion or the loss of all economically viable use.'") (quoting David

"[t]he aim of the Clause is to prevent the government 'from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" E. Enters. v. Apfel, 524 U.S. 498, 522 (1998) (quoting Armstrong v. United States, 364 U.S. 40, 49 (1960)); see also Agins v. City of Tiburon, 447 U.S. 255, 260 (1980) ("The determination that governmental action constitutes a taking is, in essence, a determination that the public at large, rather than a single owner, must bear the burden of an exercise of state power in the public interest.").  Importantly, the Clause "does not proscribe the taking of property; it proscribes taking without just compensation." Fla. Dep't of Transp. v. Mallards Cove, LLP, 159 So. 3d 927, 932 (Fla. 2d DCA 2015) (quoting Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 194 (1985)); see also Cedar Point Nursery v. Hassid, 594 U.S. 139, 147 (2021) ("[P]roperty must be secured, or liberty cannot exist.") (quoting Discourses on Davila, in 6 Works of John Adams 280 (C. Adams ed. 1851)).

As observed by Judge Shepherd in his dissent in Ganson v. City of Marathon, 222 So. 3d 17, 20 (Fla. 3d DCA 2016), "[t]he Takings Clause is clear and concise," but "[r]egrettably, regulatory takings jurisprudence is

---

L. Powell et al., A Measured Step to Protect Priv. Prop. Rts., 23 Fla. St. U. L. Rev. 255, 265 n.52 (1995)).

11

cryptic and convoluted." The Fifth Amendment was historically understood to apply only to "direct government appropriation or physical invasion of private property." Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 537 (2005). Over a century ago, however, the Supreme Court inaugurated the concept of regulatory takings in Pennsylvania Coal Co. v. Mahon, 260 U.S. 393 (1922). In Mahon, the Court recognized that the Takings Clause extended to overly burdensome regulations of property. Writing for an 8-1 Court, Justice Oliver Wendell Holmes observed that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." Id. at 415.

## A

Identifying those regulations that go "too far" remains a thorny issue, but guiding principles emerge from two seminal Supreme Court decisions. See Lingle, 548 U.S. at 538 ("The rub, of course, has been—and remains—how to discern how far is 'too far.'"). In the first decision, Penn Central, the Court developed a framework for assessing partial, rather than categorical, regulatory takings claims. See generally 438 U.S. at 123–24. The Court articulated a fact-specific, ad hoc inquiry, consisting of the following three factors: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed

12

expectations; and (3) the character of the governmental action. See id. at 124; see also Keshbro, Inc. v. City of Miami, 801 So. 2d 864, 871 n.12 (Fla. 2001) ("Those regulations which fall short of effecting a categorical taking are appropriately analyzed under the ad-hoc factual inquiry outlined in [Penn Central].").

In the second decision, Lucas, the Court developed a rule applicable to "total" or "categorical" regulatory takings, defined as the "relatively rare situations where the government has deprived a landowner of all economically beneficial uses." 505 U.S. at 1018; see also Bridge Aina Le'a, LLC v. Haw. Land Use Comm'n, 141 S. Ct. 731, 731 (2021) (Thomas, J., dissenting from denial of certiorari) ("[I]n more than 1,700 cases over a 25-year period, there were only 27 successful takings claims under Lucas—a success rate of just 1.6%.") (citing Carol Necole Brown & Dwight H. Merriam, On the Twenty-Fifth Anniversary of Lucas: Making or Breaking the Takings Claim, 102 Iowa L. Rev. 1847, 1849–50 (2017)). In Lucas, the property owner, David Lucas, acquired two residential lots on the Isle of Palms in Charleston County, South Carolina, to build single-family homes. 505 U.S. at 1007–08. Both lots were zoned for residential construction, and neither was subject to any use restriction. See id. at 1008. The South Carolina Legislature subsequently enacted the Beachfront Management Act, which

13

barred Lucas from erecting any permanent habitable structures on the two lots. Id. at 1007. However, he was permitted to maintain a wooden walkway and dock. Id. at 1009 n.2.

Lucas filed suit, alleging a categorical, as-applied taking. See id. at 1009. The trial court found that the Act, as applied, permanently banned construction on the property, and that this prohibition constituted a deprivation of any reasonable economic use of the lots, rendering them valueless. Id. Thus, the court ordered payment of just compensation. Id.

The Supreme Court of South Carolina reversed the judgment, finding that since Lucas did not challenge the facial validity of the Act pursuant to the government's use of police power, no compensation was due because the finding that new construction in the coastal zone threatened the public resource was unreviewable. Id. at 1010. In other words, the court ruled that "when a regulation respecting the use of property is designed to prevent serious public harm," no compensation is due, regardless of the effect on property value. Id. (quotations and citations omitted).

The United States Supreme Court granted certiorari. Writing for the majority, Justice Scalia recounted the history of regulatory takings law and noted that the Court has traditionally recognized "two discrete categories of regulatory action as compensable without case-specific inquiry into the

public interest advanced in support of the restraint." Id. at 1014–15. The first involves physical invasions of property and the second is where "regulation denies all economically beneficial or productive use of land." Id. As to the latter, "when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." Id. at 1019 (emphasis in original).

The Lucas Court repeatedly emphasized that the key to establishing a categorical, as-applied regulatory taking is a "total deprivation of beneficial use." Id. at 1017. Stated differently, "the Fifth Amendment is violated when land-use regulation . . . '*denies an owner economically viable use of his land*'" without just compensation. Id. at 1016 (quoting Agins, 447 U.S. at 260) (emphasis in original).

Justice Blackmun dissented. He contended that the property retained residual value because Lucas had the right to exclude others, . . . picnic, swim, camp in a tent, . . . live on the property in a movable trailer," and "alienate the land." Id. at 1044 (Blackmun, J., dissenting). He therefore opined that characterizing the property as "valueless" was a misnomer. See id. Justice Stevens agreed, stating, "Lucas may put his land to 'other uses'—fishing or camping, for example—or may sell his land to his neighbors as a

buffer. In either event, his land is far from 'valueless.'" Id. at 1065 n.3 (Stevens, J., dissenting).

**B**

In the aftermath of Penn Central, Lucas, and their progeny, TDRs have emerged as a popular and effective tool for local governments to promote conservation efforts and urban growth management. Such rights typically benefit the landowner by authorizing expanded "development beyond the restricted level on [another] piece of land." Ralph A. DeMeo, Transfer Development Rights, in II Florida Environmental and Land Use Law, ch. 23 (1996).

The significance of TDRs in the regulatory takings matrix has been sharply debated. Some legal commentators have opined that TDRs are irrelevant to the takings side of the equation because they do not impact the nature and extent of the property interest taken by the government.[7] Others

---

[7] See Richard D. Himberger, Transferable Development Rights, 43 Advocate 8, 12 (2000) ("If government enacts a zoning ordinance requiring a landowner to leave his real estate as open space, that regulation will emasculate all viable economic use in his land. Under the Lucas Total Deprivation Rule, such a regulation would constitute a taking of private property requiring payment of just compensation. This conclusion is not altered when a TDR program is added to the mix. The fact that the owner receives part of his just compensation in the form of TDR sales proceeds does not change the fact the taking has occurred.") (footnote omitted); see also William Hadley Littlewood, Transferable Dev. Rts., TRPA, and Takings, the Role of TDRs in the Const. Takings Analysis, 30 McGeorge L. Rev. 201,

have posited that TDRs necessarily mitigate the economic impact of regulation by infusing the property with value and therefore should be relevant in determining whether the government has effectuated a taking.[8]

---

232 (1998) ("Applying TDRs to the takings side of the Fifth Amendment's protections will prove both unworkable and inequitable."); Samantha Peikoff Adler, Penn Cent. 2.0: The Takings Implications of Printing Air Rts., 2015 Colum. Bus. L. Rev. 1120, 1181 (2015) ("While TDRs have become an important investment option and land use currency, it is questionable whether they will ever be perceived the same as property rights in land."); James E. Holloway & Donald C. Guy, The Utility and Validity of TDRs Under the Takings Clause and the Role of TDRs in the Takings Equation Under Legal Theory, 11 Penn St. Env't. L. Rev. 45, 48–49 (2002) ("Regulatory scheme providing TDRs and other benefits to reduce the constitutional liability or offset the financial impact of land use, natural resources, and environmental regulations raise a constitutional question regarding the utility and validity of TDRs under regulatory takings law and a jurisprudential question regarding the position and role of TDRs in the takings equation.") (footnotes omitted); R.S. Radford, Takings and Transferable Dev. Rts. in the Sup. Ct.: The Const. Status of TDRs in the Aftermath of Suitum, 28 Stetson L. Rev. 685, 687 (1999) ("[T]he TDR concept is diffuse and flexible and—as was unfortunately demonstrated by the facts of Suitum—capable of serious abuse.") (footnote omitted); David A. Dana, Nat. Pres. and the Race to Dev., 143 U. Pa. L. Rev. 655, 669 (1995) ("The most troubling aspect of a regime of uncompensated natural preservation regulation may be that it encourages investors to accelerate development."); Michael M. Berger, Vindicating the Rts. of Priv. Land Dev. in the Cts., 32 Urb. Law 941, 965 (2000) ("Contrary to some extreme lower court assertions, the right to build on one's property is *not* a governmentally conferred benefit.") (emphasis in original).

[8] See Arden H. Rathkopf et al., Relation to Constitutional Taking Claims—As Factor on Merits of Claim, in 3 Rathkopf's The Law of Zoning and Planning § 59:17 (4th ed. 2023) ("[E]conomic value of available TDRs are to be considered in determining whether an owner is provided with a reasonable return on his investment and might possibly result in rejection of such a claim even where economically viable developmental uses of the particular restricted site are prohibited."); Jennifer Scro, Navigating the

The Supreme Court has yet to clarify this conundrum.[9]  The issue was tangentially implicated in Suitum v. Tahoe Regional Planning Agency, 520 U.S. 725 (1997).  There, writing for the majority, Justice Souter observed,

> While the pleadings raise issues about the significance of the [TDRs] both to the claim that a taking has occurred and to the constitutional requirement of just compensation, we have no occasion to decide, and we do not decide, whether or not these [TDRs] may be considered in deciding the issue whether there has been a taking in this case, as opposed to the issue whether just compensation has been afforded for such a taking.  The sole question here is whether the claim is ripe for adjudication . . . .

Id. at 728.

In a noteworthy concurrence, Justice Scalia, joined by Justices O'Connor and Thomas, squarely addressed the issue.  Concluding "the relevance of TDRs is limited to the compensation side of the takings analysis,

Takings Maze: The Use of Transfers of Dev. Rts. in Defending Reguls. Against Takings Challenges, 19 Ocean & Coastal L.J. 219, 238 (2014) ("[T]o maintain TDRs' continuing viability, courts should consider TDRs as a mitigating property right both in the takings analysis itself and for potential post-verdict compensation."); Paul Merwin, Caught Between Scalia and the Deep Blue Lake: The Takings Clause and Transferable Dev. Rts. Programs, 83 Minn. L. Rev. 815, 847–48 (1999) ("TDR programs avoid the categorical takings rule of Lucas by providing landowners with an economic use of property.  TDR programs meet the goals of the Takings Clause[] and avoid many of the evils that takings law seeks to prevent.") (footnote omitted).

[9]  Holloway & Guy, supra note 7, at 84–85 ("This question is a constitutional concern that demands further consideration under jurisprudential concepts defining economic, political, and legal relationships of property and liability rules.").

and that taking them into account in determining whether a taking has occurred [would] render much of [the Court's] regulatory takings jurisprudence a nullity," id. at 750 (Scalia, J., concurring in part and concurring in judgment), Justice Scalia reasoned that

> TDRs, of course, have nothing to do with the use or development of the land to which they are (by regulatory decree) "attached." The right to use and develop one's own land is quite distinct from the right to confer upon someone else an increased power to use and develop *his* land. The latter is valuable, to be sure, but it is a *new* right conferred upon the landowner in exchange for the taking, rather than a *reduction* of the taking. In essence, the TDR permits the landowner whose right to use and develop his property has been restricted or extinguished to extract money from others. Just as a cash payment from the government would not relate to whether the regulation "goes too far" (i.e., restricts use of the land so severely as to constitute a taking), but rather to whether there has been adequate compensation for the taking; and just as a chit or coupon from the government, redeemable by and hence marketable to third parties, would relate not to the question of taking but to the question of compensation; so also the marketable TDR, a peculiar type of chit which enables a third party not to get cash from the government but to use his land in ways the government would otherwise not permit, relates not to taking but to compensation.

Id. at 747 (emphasis in original).

More recently, in Horne v. Department of Agriculture, 576 U.S. 350 (2015), Chief Justice Roberts, writing for the majority, invoked Justice Scalia's Suitum concurrence for the proposition that "once there is a taking, as in the case of a physical appropriation, any payment from the Government in connection with that action goes, at most, to the question of just

compensation." Id. at 364. This is consistent with Justice Thomas's recent reiteration of the Lucas principle that "[a] regulation effects a taking . . . categorically whenever [it] . . . leaves *land* 'without economically beneficial or productive options for its *use*.'" Bridge Aina Leʻa, LLC, 141 S. Ct. at 731 (Thomas, J., dissenting from denial of certiorari) (quoting Lucas, 505 U.S. at 1018) (emphasis added); see also Lingle, 544 U.S. at 539 (reaffirming that under Lucas, "the complete elimination of a property's value is the determinative factor"); Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency, 535 U.S. 302, 330 (2002) ("Under that rule, a statute that 'wholly eliminated the value' of Lucas' fee simple title clearly qualified as a taking. But our holding was limited to 'the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted.'") (quoting Lucas, 505 U.S. at 1017) (emphasis in original).

**C**

Against this jurisprudential landscape, we examine the summary judgment record in the instant case. Appellants established that regulation deprived them of any use of the property beyond beekeeping or personal camping. Casting aside the inherent logistical challenges in accessing an island without a dock fringed with high quality hammock and mangroves, these activities are not economically productive. It is axiomatic that "a State

20

may not evade the duty to compensate on the premise that the landowner is left with a token interest." See Palazzolo v. Rhode Island, 533 U.S. 606, 631 (2001).

The City advances the somewhat circular argument that a future sale of the island for beekeeping and personal camping is an economic use that precludes a Lucas taking. The United States Court of Appeals for the Federal Circuit recently considered and rejected a similar argument. In Lost Tree Village Corporation v. United States, 787 F.3d 1111 (Fed. Cir. 2015), cert. denied, 582 U.S. 952 (2017), the Court of Federal Claims held that the government's denial of a landowner's application for a permit to fill wetlands on an approximately five-acre tract constituted a categorical regulatory taking. Id. at 1114. On appeal, the government argued "that a landowner's ability to sell an affected parcel is an economic use that precludes Lucas's per se treatment." Id. at 1117. The appellate court first noted the infirmities inherent in tying economic use to a future sale, stating that "[s]peculative land uses are not considered as part of a takings inquiry." Id. (citing Olson v. United States, 292 U.S. 246, 257 (1934)). It then flatly rejected the proposition that "all sales qualify as economic uses." Id. The court explained that, instead, the relevant inquiry is whether the landowner retains an underlying economic use, and "[w]hen there are no underlying economic

21

uses, it is unreasonable to define land *use* as including the sale of the land." Id. (emphasis in original). This is because "[t]ypical economic uses enable a landowner to derive benefits from land ownership rather than requiring a landowner to sell the affected parcel." Id. (citing Kirby Forest Indus., Inc. v. United States, 467 U.S. 1 (1984) (logging); United States v. 50 Acres of Land, 469 U.S. 24 (1984) (landfilling); and United States v. Fuller, 409 U.S. 488 (1973) (livestock grazing)).

This rationale is consistent with other cases. See Bridge Aina Le'a, LLC v. Land Use Comm'n, 950 F.3d 610, 628 (9th Cir. 2020) ("[T]he relevant inquiry for us is whether the land's residual value reflected a token interest or was attributable to noneconomic use."); see also Nekrilov v. City of Jersey City, 45 F.4th 662, 671 n.3 (3d Cir. 2022) ("The plaintiffs are correct that the ability to sell a property does not always constitute an economically beneficial use."); 83 Am. Jur. 2d Zoning and Planning § 743 ("The fact that a piece of property has a potential for sale . . . does not, in and of itself, detract from a . . . clear showing that a parcel is not susceptible to a beneficial use.") (citing Marchi v. Town of Scarborough, 511 A.2d 1071, 1073 (Me. 1986)); Res. Invs., Inc. v. United States, 85 Fed. Cl. 447, 486–88 (2009) ("Both in its holding and its reasoning, Lucas . . . focuses on whether a regulation permits *economically viable* use of the property, not whether the property retains

some value on paper. . . .  To be sure, the complete elimination of a property's value may be *sufficient* to establish a categorical taking under many circumstances, given the obvious correlation between uses and their market values; a parcel of real property without value would usually have no lawful economically viable use.  Yet the lack of value is not *necessary* to effect a taking, as a parcel will typical[ly] retain some quantum of value even without economically viable use.  Such a scintilla of value is insufficient to defeat an otherwise-viable takings claim.") (emphasis added) (citations and footnotes omitted); Del Monte Dunes at Monterey, Ltd. v. City of Monterey, 95 F.3d 1422, 1433 (9th Cir. 1996) ("[T]he mere fact that there is one willing buyer of the subject property, especially where that buyer is the government, does not, as a matter of law, defeat a taking claim."); State ex rel. AWMS Water Sols., L.L.C. v. Mertz, 165 N.E.3d 1167, 1181 (Ohio 2020) (finding that potential subletting of property to third-party "does not rise to the level of an economically beneficial use under Lucas"); Banker's Choice, LLC v. Zoning Bd. of Appeals of Cincinnati, 170 N.E.3d 923, 929–30 (Ohio Ct. App. 1st Dist. 2021) ("A regulation denies an owner all economically viable use of the owner's land if it restricts the use of the land so as to render it valueless, the permitted uses are not economically feasible, or the regulation permits only uses which are highly improbable or practically impossible under the

23

circumstances. . . . However, an owner's ability to sell an affected property does not constitute an economically beneficial use . . . .") (quotations and citations omitted).

We must therefore consider the alternative contention that there was no Lucas taking because, by granting TDRs through ROGO and BPAS points, the City "creat[ed] and convey[ed] a separate [property] interest that has value on the market." Adam Riff, The Eminent Domain Path Out of a Pub. Pension Crisis, 37 Cardozo L. Rev. 307, 339 n.172 (2015). As Justice Scalia observed in his Suitum concurrence, any income associated with TDRs does not flow from cultivating or developing the property in the traditional framework of ownership. See 520 U.S. at 747 (Scalia, J., concurring in part and concurring in judgment). Instead, the potential revenue is generated from the preservation and non-use of the property. See id.

Consistent with this logic, while "[p]utting TDRs on the taking rather than the just compensation side of the equation" when a landowner has been deprived of all economic use of the property "is a clever, albeit transparent, device that seeks to take advantage of a peculiarity of our Takings Clause jurisprudence," doing so effectively creates a Fifth Amendment loophole. Id. at 747–48. This approach allows the government to effectively appropriate

private property for a public purpose and provide some compensation, without the constitutional stricture of just compensation, rendering the holding in Lucas nugatory. As William Handle Littlewood explained in Transferable Development Rights, TRPA, and Takings, the Role of TDRs in the Constitutional Takings Analysis,

> Although many . . . would not be concerned with this outcome, they fail to recognize the underlying rationale of the Lucas decision. The underpinning of Lucas is that regulatory schemes seeking to keep land in its natural state place such a burden on the landowner that even the most compelling state interest will not suffice absent just compensation. Inverse condemnation claims based on the reasoning in Lucas will become obsolete if we allow TDRs into the "takings" side of the analysis. This will result because every regulatory scheme concerned with approaching the level of a taking will contain a provision allocating TDRs to the burdened landowners, thus circumventing Lucas.

Littlewood, supra note 7, at 225 (footnotes omitted).[10]

---

[10] See also Luke A. Wake, The Enduring (Muted) Legacy of Lucas v. S.C. Coastal Council: A Quarter Century Retrospective, 28 Geo. Mason U. Civ. Rts. L.J. 1, 29 n.147 (2017) (explaining TDRs are not only "transparently designed to immunize government from takings liability," but are further suspect because "[i]n the wake of Koontz v. St. Johns River Mgmt. Dist., 133 S. Ct. 2586 (2013), it is clear that the government bears a heightened burden under the Takings Clause to justify conditions requiring payment of money as a term of obtaining a discretionary land use approval. In other words, a developer might also challenge a requirement to purchase a TDR under Nollan v. Cal. Coastal Comm'n, 483 U.S. 825, 838 (1987) and Dolan v. City of Tigard, 512 U.S. 374, 392 (1994), which adds even further reason to doubt the viability of a functioning market for TDR sales, which is of course a premise of the entire TDR regime").

**D**

Of course, that is not to say that TDRs never have relevance in determining whether a taking has occurred. Penn Central presents one such example. There, unlike here, the property owners retained a beneficial use of the affected parcel but were prohibited from fully developing airspace above Grand Central Terminal. See Suitum, 520 U.S. at 748 (Scalia, J., concurring in part and concurring in judgment). New York City awarded the property owners TDRs, and the Supreme Court accounted for the TDRs when evaluating the impact of the government's regulation. But as Justice Scalia explained in his Suitum concurrence, "[the Penn Central] analysis can be distinguished . . . on the ground that it was applied to landowners who owned at least eight nearby parcels, some immediately adjacent to the terminal, that could be benefited by the TDRs." Id. at 749; see also Penn Cent. Transp. Co., 438 U.S. at 137 ("Their ability to use these rights has not been abrogated; they are made transferable to at least eight parcels in the vicinity of the Terminal, one or two of which have been found suitable for the construction of new office buildings.").

We find Justice Scalia's reasoning cogent and persuasive. Allowing the government to avoid a categorical, as-applied takings claim by awarding TDRs is constitutionally infirm, and here, the downzoning barred appellants

from improving or developing Shands Keys in any manner. This left appellants with only a token interest in the property. Because the City simultaneously deemed "conservation" the only future use, appellants were required to perpetually preserve Shands Key in its natural state. The "newly legislated or decreed (without compensation)" regulation that left appellants with this token interest did not "inhere in the title itself [or] in the restrictions that background principles of [Florida] law of property and nuisance already place upon land ownership." Lucas, 505 U.S. at 1029.

## IV

As the Lucas court observed, regulations "requiring land to be left substantially in its natural state . . . carry with them a heightened risk that private property is being pressed into some form of public service under the guise of mitigating serious public harm." Id. at 1018. And in this case, the regulation was more onerous than that which went "too far" in Lucas.[11] Lucas was authorized to maintain a dock and wooden walkway on his beachfront lots, while appellants in this case were prohibited from even constructing a dock on Shands Key. Accordingly, as Justice Scalia explained in Lucas, the City "may resist compensation only if the logically antecedent inquiry into the

---

[11] Appellants compellingly argue that the regulation in this case is akin to involuntarily imposing a perpetual conservation easement for the benefit of the public.

27

nature of [appellants'] estate shows that the proscribed use interests were not part of [their] title to begin with." Id. at 1027. As this exception is not implicated, we conclude that appellants were entitled to partial summary judgment on their categorical, as-applied claim. To the extent that Beyer I, 37 So. 3d 932, Beyer II, 197 So. 3d 563, Shands I, 999 So. 2d 718, Shands II, 261 So. 3d 750, and Ganson, 222 So. 3d 17, may be viewed as previously holding that an award of TDRs will always be sufficient to defeat a categorical takings claim under Lucas, we hereby recede from those decisions. The final judgment is reversed and remanded with instructions for the trial court to enter partial summary judgment in favor of appellants.

Reversed and remanded.

EMAS, FERNANDEZ, SCALES, LINDSEY, GORDO, LOBREE, BOKOR, and GOODEN, JJ., concur.

SCALES, J., concurring.

I concur in the majority opinion and write only to explain why I do not see the majority opinion as upending constitutional law or resulting in the City's economic calamity.

> *A. The Island's Rezoning Coupled with the City's High-Quality Hammock Designation Effected a Regulatory Taking under Lucas*

Dr. Shands owned a 7.9-acre offshore island in the Florida Keys zoned General Use ("GU"). Pursuant to that GU zoning, Dr. Shands was able to build seven single-family homes (one per acre).

For legitimate public policy reasons, though, the island's zoning was changed from GU to Conservation Offshore Island. As a result of the island's rezoning, coupled with the City's prohibition on development in areas (such as the island) classified as high-quality hammocks, no construction is now permitted on the island, not even a dock.

Presumably, people can swim to the island to camp and bee-keep (i.e., the only uses permitted under the Conservation Offshore Island zoning), but, from a practical perspective, the island's zoning change and high-quality hammock designation prevent appellants from any meaningful economic use

of their island. In this regard, appellants are in a similar position to David Lucas, whose two waterfront lots were rendered economically unviable by South Carolina's legitimate and well-meaning Beachfront Management Act. See Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1006-07 (1992).

Like the Beachfront Management Act examined under Lucas, the City's zoning ordinance has constitutional implications. As correctly concluded by both the City's hearing officer and the majority, the re-zoning of the island coupled with its high-quality hammock designation implicate the constitution per Lucas because the City's regulatory scheme has deprived the island of all economically beneficial use. As discussed in more detail below, the City owes appellants "just compensation" because the City's offer of $147,000 worth of transferable development rights did not infuse the island with value to prevent a regulatory taking under Lucas.

> *B. TDRs are No Longer Relevant to Determine Whether a Regulatory Taking Has Occurred, but are Relevant to the "Just Compensation" Side of the Takings Equation*

In what can only be described as a trailblazing decision, the majority holds that, as a matter of constitutional law, the availability of TDRs[12] does not infuse value into property otherwise rendered valueless by the regulation. The majority, adopting the rationale expressed by Justice Scalia's concurring opinion in Suitum v. Tahoe Regional Planning Agency, 520 U.S. 725, 745 (1997), holds that the availability of TDRs is not to be considered in the analysis of whether a regulatory taking under Lucas has occurred, but is relevant to the just compensation side of the takings equation (Op. at 16-20).

### C. How to Apply TDRs to the Just Compensation Side of the Takings Equation

While I concur in the majority opinion's holding, it bears noting that neither the majority opinion, nor Justice Scalia's concurrence in Suitum, discusses the practical mechanics of exactly *how* TDRs are to be considered "as part of the just compensation side of the takings equation." Because I am concerned that the instant decision leaves trial courts, local governments, property owners and practitioners without a framework to apply this new TDR/just compensation rubric (at least until an authority higher than this concurring opinion provides guidance), I offer the following.

---

[12] In a TDR system, the government provides a property owner the right – which the property owner may sell to a third party – to undertake development on property other than the property affected by the regulation.

As a practical matter, because the value of TDRs is set in the marketplace and is easily determined, I presume the vast majority of regulatory takings cases will be settled (without the uncertainty, delay and expense occasioned by a jury trial) with the property owner accepting the government's TDR offer as just compensation, so long as the offer is reasonable and generous. TDR offers from government should be generous because TDRs, like the regulations from which TDRs provide valuable relief, are creations of government. Not only do TDRs require no appropriation of taxpayer funds, but the development occasioned by TDRs generally results in more ad valorem tax revenue for the government.[13]

Of course, under Florida's existing takings jurisprudence, I suspect a local government cannot force an owner to accept TDRs in lieu of cash as just compensation for a regulatory taking. But, presumably, if a written offer of TDRs in lieu of cash is made by the local government to the owner, the value of offered TDRs can certainly be taken into consideration in

---

[13] For illustration purposes only, the City may, on remand, hypothetically choose to offer appellants, in lieu of cash, sufficient TDRs for a developer to build a profitable, affordability-restricted apartment complex. Given the relative scarcity of, and expense associated with otherwise obtaining, such TDRs, a hypothetical developer might be inclined to purchase those offered TDRs from appellants for a price less than what the developer would otherwise pay, but which compensates appellants for the damages sustained as a result of the City's regulatory taking of appellants' island.

determining whether an award of attorney's fees is appropriate, and, if so, the amount of such award.[14] And certainly, after a jury determines the damages that a regulatory taking has caused a property owner, the parties may negotiate a settlement where the owner accepts TDRs as an alternative to either party's appeal.

Thus, to the extent necessary to facilitate the use of TDRs as just compensation, local governments may consider amending their land development regulations to formalize the employment of TDRs as compensation for a regulatory taking. Accordingly, local governments and practitioners may wish to keep close tabs on marketplace transactions

---

[14] Section 73.092 of the Florida Statutes provides that, in eminent domain proceedings, when a written offer is made by the government to an owner, attorney's fees are awardable to the owner based solely on the "benefits achieved for the client." § 73.092(1), Fla. Stat. (2024). Section 73.092 is applicable also in inverse condemnation proceedings. City of N. Miami Beach v. Reed, 863 So. 2d 351, 352-53 (Fla. 3d DCA 2003).

While Section 73.092(1)(a) generally defines "benefits" as the difference between the final judgment and the government's written offer, section 73.092(1)(b) expressly authorizes the trial court, in determining whether an attorney has provided a "benefit" to the client, to consider nonmonetary benefits obtained, so long as such nonmonetary benefits can be easily quantified. Presumably, to give effect to the majority's constitutional dictate that TDRs are to be considered on the just compensation side of the takings equation, a trial court judge, in determining whether an attorney has provided a benefit to the client for section 73.092's purposes, must also now consider the value of TDRs (i.e., a nonmonetary benefit) contained in a written settlement offer made pursuant to section 73.092.

relating to TDRs so that the accurate valuation of such TDRs can be readily accessed. It seems to me that the proper and considered use of TDRs on the compensation side of the takings equation as required by the majority opinion should not have a calamitous effect on local governments' pocketbooks.

GORDO, J., concurring.

I concur in the majority opinion. I write separately to address my belief that the dissent's separation of powers argument is decidedly misplaced. This is not a case in which this Court is invading the province of the legislative branch or expanding its own power improperly. In my view, this is a case in which the Court is exercising its most important role envisioned by our founding fathers—safeguarding individual constitutional rights against government overreach.

## I.

"The cornerstone of American democracy known as separation of powers recognizes three separate branches of government—the executive, the legislative, and the judicial—each with its own powers and responsibilities." Bush v. Schiavo, 885 So. 2d 321, 329 (Fla. 2004). "Our Constitution's separation of powers . . . is the absolutely central guarantee of a just Government and the liberty that it secures for us all." Trump v. United States, 603 U.S. 593, 650 (2024) (Thomas, J., concurring) (internal quotation marks and citation omitted). "Without a secure structure of separated powers, our Bill of Rights would be worthless, as are the bills of

35

rights of many nations of the world that have adopted, or even improved upon, the mere words of ours." Morrison v. Olson, 487 U.S. 654, 697 (1988) (Scalia, J., dissenting).

In Florida, the constitutional doctrine has been expressly codified in article II, section 3 of the Florida Constitution, which divides the state's government into three branches and expressly prohibits one branch from exercising the powers of the other two branches:

> The powers of the state government shall be divided into legislative, executive and judicial branches. No person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein.

Art. II, § 3, Fla. Const.

The Florida Supreme Court has explained that the separation of powers doctrine "encompasses two fundamental prohibitions." Chiles v. Child. A, B, C, D, E, & F, 589 So. 2d 260, 264 (Fla. 1991). "The first is that no branch may encroach upon the powers of another." Id. "The second is that no branch may delegate to another branch its constitutionally assigned power." Id. It rests soundly on principles that each branch of the government, both federal and state, will stay in its own lane and affirmatively act only when the ball is in its court. The majority, in my view, properly strikes the proverbial "government overreach ball" squarely before it for violating

appellants' constitutional right not to have their property taken without full compensation.

## II.

While the dissent pointedly accuses the majority of invading the province of the other branches, it is the fundamental role of the judiciary to say what the law is. See Marbury v. Madison, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."). "As the United States Supreme Court has explained, the power of the judiciary is 'not merely to rule on cases, but to *decide* them, subject to review only by superior courts[.]'" Bush, 885 So. 2d at 330 (quoting Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 218-19 (1995)).

"Under the express separation of powers provision in our state constitution, the judiciary is a coequal branch of the Florida government vested with the sole authority to exercise the judicial power[.]" Id. (internal quotation marks and citation omitted). "The judicial power, as originally understood, requires a court to exercise its independent judgment in interpreting and expounding upon the laws." Loper Bright Enters. v. Raimondo, 603 U.S. 369, 414 (2024) (Thomas, J., concurring) (citation omitted). "Under the basic concept of separation of powers that flows from the scheme of a tripartite government adopted in the Constitution, the judicial

37

Power . . . cannot be shared with the other branches." SEC v. Jarkesy, 603 U.S. 109, 127 (2024) (internal quotation marks and citation omitted). "Or, as Alexander Hamilton wrote in The Federalist Papers, 'there is no liberty if the power of judging be not separated from the legislative and executive powers.'" Id. (quoting The Federalist No. 78 (Alexander Hamilton)).

### III.

The Takings Clause of the Fifth Amendment provides: "[N]or shall private property be taken for public use, without just compensation." Amend. V, U.S. Const. It is noteworthy that the Florida Constitution has its own takings provision, which provides that "[n]o private property shall be taken except for a public purpose and with full compensation therefor paid . . . ." Art. X, § 6(a), Fla. Const.

While the Florida Supreme Court has interpreted the takings clauses of the United States and Florida Constitutions "coextensively,"[15] the Florida Constitution expands the Fifth Amendment's constitutional guarantee by affording property owners more expansive compensation protections by not simply offering a subjective version of "just compensation" but by requiring "full compensation." See Joseph B. Doerr Tr. v. Cent. Fla. Expressway

---

[15] See St. Johns River Water Mgmt. Dist. v. Koontz, 77 So. 3d 1220, 1226 (Fla. 2011), rev'd on other grounds, 570 U.S. 595 (2013).

38

<u>Auth.</u>, 177 So. 3d 1209, 1215 n.5 (Fla. 2015) (recognizing that the Florida Constitution provides for more extensive compensation than the Fifth Amendment's Takings Clause because "full compensation" provided by the Florida Constitution includes reasonable attorney's fees for the property owner).

As originally understood—and as its name indicates—the Takings Clause of the Fifth Amendment applied only to direct, physical takings. <u>See</u> William Michael Treanor, <u>The Original Understanding of the Takings Clause and the Political Process</u>, 95 Colum. L. Rev. 782, 798 (1995) ("The predecessor clauses to the Fifth Amendment's Takings Clause, the original understanding of the Takings Clause itself, and the weight of early judicial interpretations of the federal and state takings clauses all indicate that compensation was mandated only when the government physically took property."); Jay T. Jarosz, <u>Enough Is Enough, Unless of Course, It's Not: A Missed Opportunity to Reexamine the Ambiguity of *Penn Central*</u>, 54 Suffolk U. L. Rev. 109, 109 (2021) ("The Founders envisioned the Takings Clause as a way to compensate property owners whose tangible property was physically seized by the government."); Aziz Z. Huq, <u>Property Against Legality: Takings After *Cedar Point*</u>, 109 Va. L. Rev. 233, 235 (2023) ("In a leading constitutional treatise of the early Republic, St. George Tucker

. . . identified the Takings Clause of the Fifth Amendment as a means to restrain the arbitrary and oppressive mode of obtaining supplies for the army, and other public uses.") (internal quotation marks and citation omitted); Horne v. USDA, 576 U.S. 350, 360 (2015) ("Prior to this Court's decision in Pennsylvania Coal Co. v. Mahon, 260 U.S. 393 (1922), the Takings Clause was understood to provide protection only against a direct appropriation of property—personal or real.  Pennsylvania Coal expanded the protection of the Takings Clause, holding that compensation was also required for a 'regulatory taking'—a restriction on the use of property that went 'too far.'" (quoting Id. at 415)).

This narrowly drafted provision is representative of the basic political values of the founding fathers.  The founders, believing in a representative democracy, never intended the Takings Clause to reach government regulation because "they believed it was the appropriate responsibility of democratic decision-makers to balance individual property interests against other community interests."  William Michael Treanor, The Original Understanding of the Takings Clause, Georgetown Environmental Law & Policy Institute Papers & Reports, at 5 (1998).

Over the course of the nation's history, however, we have seen significant growth of government regulation.  As we evolved into new and

unchartered regulatory schemes, courts were faced with applying the Takings Clause to modern conditions of comprehensive regulation not originally envisioned by the founders.  A consequence of this is that modern takings jurisprudence has essentially ignored the original understanding of the Takings Clause.  See Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1028 n.15 (1992) (J. Scalia writing: "Justice Blackmun is correct that early constitutional theorists did not believe the Takings Clause embraced regulations of property at all, but even he does not suggest (explicitly, at least) that we renounce the Court's contrary conclusion in [Pennsylvania Coal Co. v.] Mahon.  Since the text of the Clause can be read to encompass regulatory as well as physical deprivations (in contrast to the text originally proposed by Madison), we decline to do so as well.") (cleaned up); Andrew S. Gold, The Diminishing Equivalence Between Regulatory Takings and Physical Takings, 107 Dick. L. Rev. 571, 581 (2003) ("As the Lucas Court emphasized, compensation for regulatory takings can be justified by the functional similarity between the effect of a regulation and a direct, physical taking of property.").

**IV.**

The majority here is not "expand[ing] the Court's authority relative to that of the other branches of government" so as to violate the separation of

41

powers doctrine as the dissent suggests. Rather, we are simply enforcing the takings provisions of the United States and Florida Constitutions guaranteeing the natural right of property ownership and proscribing the taking of property without full and just compensation. See Wellness Int'l Network, Ltd. v. Sharif, 575 U.S. 665, 714 (2015) (Thomas, J., dissenting) ("[T]he judiciary is that department of the government to whom the protection of the rights of the individual is by the constitution especially confided.") (internal quotation marks and citation omitted); Dade Cnty. Classroom Tchrs. Ass'n, Inc. v. Legislature, 269 So. 2d 684, 687 (Fla. 1972) ("The doctrine of judicial authority and responsibility was early established in the historic case of Marbury v. Madison, 5 U.S. 137 (1803); and in the many years since then—particularly in the last quarter of a century—the courts have not hesitated to accomplish by judicial fiat what other divisions of government have failed or refused to do in protecting, implementing, or enforcing constitutional rights.").

The regulatory scheme as applied, which deprives Shands Key of all economically beneficial use, can only stand if we abrogate our duty to independently preserve and safeguard appellants' fundamental constitutional right. As I see it, failing to vindicate a right expressly stated in

the Constitution is not judicial restraint but judicial abnegation.  **That we must not do.**

FERNANDEZ, SCALES, BOKOR, and GOODEN, JJ., concur.

LOGUE, C.J., dissenting.

In this inverse condemnation case brought under the Fifth and Fourteenth Amendments, the hurricane regulation at issue requires offshore islands in the Florida Keys to have ten acres to build a residence. The owners of an offshore island of seven acres claimed this regulation constituted a taking. They argued the regulation essentially limited the owners to the island's value marketed for its transferable development rights and for recreational purposes in its natural state.

It is undisputed that the unique economy of the Florida Keys provides an active, competitive market among private buyers for (1) transferable development rights, and (2) islands in their natural state available for recreational uses. The first use provides the island a value of six times its purchase price; the second use provides the island a value of three times its purchase price. These facts were properly established in the summary judgment and trial record. The case went to a bench trial and the trial court concluded no taking occurred, finding these values provided the owners a reasonable return on their investment based on investment-backed expectations.

44

In an extraordinary feat of legal acrobatics, however, the majority opinion somersaults over these facts, as well as decades of well-established U.S. Supreme Court and Florida precedents, to reverse the trial court and find a taking. In doing so, it inserts the courts into land use policy issues that the U.S. Constitution assigns to the political branches of government. I respectfully dissent.

## OVERVIEW OF THIS DISSENT

Contrary to the majority opinion, the only reliable touchstone to determine if a regulatory taking occurred warranting compensation is not a judge's subjective opinion regarding a property's "productive use" but the objective value the property commands in a free and competitive market. If the property subject to the regulation provides a reasonable return on investment, as the trial court found here, there can be no taking under the Fifth Amendment.

Regulatory takings analysis must examine "the impact of the restriction on the value of the parcel as a whole." Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 130 n.27 (1978). The majority opinion ducks consideration of "the value of the property as a whole" in two ways. First, it excludes the value of the property's transferable development rights marketed to third parties. But Penn Central expressly included transferable

45

development rights. And <u>Penn Central</u> has been consistently interpreted to mean the value of those rights marketed to third parties. The majority opinion breaks from this uniform body of precedent.

Second, unable to reverse solely on that ground, the majority opinion excludes the value of the island marketed for recreational use in its natural state. It does so even though the undisputed record shows that islands held in their natural state for recreational uses command significant value in an active, competitive market among private buyers in the Florida Keys. The majority opinion is again the only court in the nation so holding. The cases it cites are inapposite because they involve instances where there was no competitive market among private buyers for the subject properties held in their natural state.

The majority's reliance on <u>Lucas v. South Carolina Coastal Council</u>, 505 U.S. 1003 (1992), to exclude categories of value is grossly misplaced. <u>Lucas</u> allows a judge to bypass the fact-intensive review required by <u>Penn Central</u> and to declare a "categorical" taking in the "rare" circumstance where "the regulation wholly eliminated the value of the claimant's land" and "rendered [the owner's] parcels 'valueless.'" <u>Id.</u> at 1007, 1018, 1026. But no one in this case suggests the island at issue was rendered valueless.

The majority instead claims that <u>Lucas</u> switched the focus from objective "market value" to subjective "productive use." This claim has been rejected by the Supreme Court twice. <u>Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency</u>, 535 U.S. 302, 332 (2002) ("[T]he categorical rule in <u>Lucas</u> was carved out for the 'extraordinary case' in which a regulation permanently deprives property of **all value**[.]") (emphasis added); <u>Lingle v. Chevron U.S.A. Inc.</u>, 544 U.S. 528, 539 (2005) ("In the <u>Lucas</u> context, of course, the complete elimination of a **property's value** is the determinative factor.") (emphasis added).

Finally, the upshot of the majority opinion is to streamline and expedite the process to declare legislative acts an unconstitutional taking. This is contrary to my understanding of separation of powers. We should recognize that "legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts." <u>Mo., Kan., & Tex. Ry. Co. of Tex. v. May</u>, 194 U.S. 267, 270 (1904) (Holmes, J.). I believe the courts should always incline to the most restrained, careful, and painstaking approach before declaring a law unconstitutional. The trial court should be affirmed and applauded, not reversed, for doing that here.

# BACKGROUND

## I.     The Regulations.

The regulations at issue are part of a network of laws that the political branches determined are necessary to protect lives and property values in the Keys from hurricanes. The Keys are a half-mile wide scattering of reefs and small islands that lie barely above sea level. They project over a hundred miles into one of the busiest hurricane corridors on Earth. They are connected to the mainland by a single narrow road. The property values of the residents depend on water quality; their lives depend on timely hurricane evacuation.

The Florida Legislature designated the Florida Keys as an area of "critical state concern" in the Florida Keys Area Protection Act. § 380.0552(3), Fla. Stat. It did so not only to protect the Keys' economy and ecosystem, but most importantly to "[e]nsure that the population of the Florida Keys can be safely evacuated" during "hurricanes." § 380.0552(2)(j), Fla. Stat. As explained in an annual report mandated by the Legislature:

> The Florida Keys are a chain of lushly vegetated tropical islands surrounded by clear shallow ocean waters teeming with sea life. The islands are connected by a narrow ribbon of U.S. Highway 1 stretching 112 miles and spanned by 19 miles of bridges. The highest point of elevation along these rocky islands is only 18 feet above sea level and there is no point that is more than four miles from

48

> water. The Florida Keys are isolated from the rest of the state and receive electricity and potable water from Florida City, located on the Florida mainland.
>
> Access to and from the Keys is primarily by U.S. Highway 1. Evacuation of the Keys' population in advance of a hurricane strike is essential for public safety. No hurricane shelters are available in the Florida Keys for Category 3-5 hurricane storm events. A system of managed growth was developed to ensure the ability to evacuate within the 24-hour evacuation clearance time as required by section 380.0552(9)(a)2., Florida Statutes.

Div. of Cmty. Dev., Fla. Dep't of Econ. Opportunity, Fla. Keys Area of Critical State Concern, ANN. REP. 3–4 (2020). To ensure safe hurricane evacuation, the State placed a cap on permits for new residential structures built in the Keys. Id. at 4.

In response to the cap on residential structures, the City of Marathon adopted several related ordinances. One ordinance required ten acres of upland to build a residence on an offshore island zoned for conservation. See MARATHON, FLA., ORDINANCES app. A, § 103.15. Other ordinances gave undeveloped parcels transferable development rights, including Building Permit Allocation System points, which can be used by the owner or marketed to third parties. See, e.g., MARATHON, FLA., ORDINANCES app. A, ch. 107, art. 1–3.

49

## II. The Case Before Us.

The central question the property owners raised in their lawsuit is whether the requirement of ten acres to construct a residence rises to the level of a regulatory taking of their property by denying them all economic use of their property.

In the property owners' pretrial summary judgment motion relied upon by the majority opinion, the property owners maintained that the City's regulation constituted a categorical taking under Lucas. In opposition, the City filed the deposition of one of the property owners which indicated that the property owners' father purchased the island in 1957 for $20,500. The deposition also reflected that no improvements were made to the property; the island has no bridge and no access to water, electricity, trash removal, or sewerage disposal. The City filed the affidavit of its appraiser. As he would later do at trial, the appraiser testified to the following points. An active, private market existed in the Keys for transferable development rights. Based on comparable sales, if sold for those rights, the island had a fair market value of $147,000. Also, an active, private market existed in the Keys for islands with their uses limited to recreation. Based on the comparable sales of islands in the Keys sold for recreational uses, the island had a fair market value of $60,000.

50

The property owners' argument in their summary judgment motion required the trial court to decide if the appraiser's testimony of value created an issue of fact as to whether "the regulation wholly eliminated the value of the claimant's land." Lucas, 505 U.S. at 1026. The property owners did not contest the adequacy of the appraiser's affidavit or otherwise contest the facts that the City submitted into the summary judgment record. Instead, they argued that the value of property should not include its value marketed for transferable development rights or recreational uses.

Applying Florida's old, subjective summary judgment standard, which disfavored summary judgments in a lopsided manner,[16] and relying on this Court's binding precedents that recognized the value of transferable development rights and recreational uses, two of which were law of this case,[17] the trial court denied the property owners' motion and found that

---

[16] Florida's old summary judgment standard required that summary judgment be denied "[i]f the record reflects the existence of any genuine issue of material fact or the possibility of any issue, or if the record raises even the slightest doubt that an issue might exist . . . ." Raven v. Roosevelt REO US LLC, 278 So. 3d 245, 247 (Fla. 3d DCA 2019) (quoting Johnson v. Deutsche Bank Nat'l Tr. Co. Ams., 248 So. 3d 1205, 1208 (Fla. 2d DCA 2018)) (emphases added). In a development welcomed by the general legal community, the Florida Supreme Court has since adopted a more modern, rational, and objective summary judgment standard. In re Amends. to Fla. Rule of Civ. Proc. 1.510, 317 So. 3d 72 (Fla. 2021).

[17] Shands v. City of Marathon, 261 So. 3d 750, 753 (Fla. 3d DCA 2019) (reversing grant of summary judgment for City under Beyer v. City of

51

"there exist genuine issues of material fact which preclude the entry of partial summary judgment." Significantly, nothing in the summary judgment record addressed the issue of whether a return of six or three times an investment over that extended period was adequate given the time value of money. That issue obviously presents a serious question. But in the absence of any undisputed testimony, that question would appear to be a question of fact concerning investment-backed expectations in a particular market, which supports the trial court's decision to send this matter to trial. See generally Penn Cent., 438 U.S. 104.

Thus, under the antiquated summary judgment standard of the time, the appraiser's testimony raised the "possibility" or "the slightest doubt" as to whether "the regulation wholly eliminated the value of the claimant's land."

---

Marathon, 197 So. 3d 563 (Fla. 3d DCA 2013), expressly because the record did not contain a valuation for the transferable development rights relied upon by the trial court); Beyer, 197 So. 3d at 567 ("The award of ROGO [or Rate of Growth Ordinance] points, coupled with the current recreational uses allowed on the property, reasonably meets the Beyers' economic expectations . . . ."), reh'g en banc denied sub nom, Ganson v. City of Marathon, 222 So. 3d 17, 18 (Fla. 3d DCA 2016), rev. denied, No. SC16-1888, 2017 WL 1365218, at *1 (Fla. Apr. 13, 2017), cert. denied, 583 U.S. 1102 (2018); Beyer v. City of Marathon, 37 So. 3d 932, 934 (Fla. 3d DCA 2010) (basing its ruling on the fact that the subject property had "additional beneficial economic value because it has transferable development rights"); Shands v. City of Marathon, 999 So. 2d 718 (Fla. 3d DCA 2008) (expressly considering transferable development rights when denying a takings challenge under Lucas).

Lucas, 505 U.S. at 1026. Given the record, the lopsided standard, and the controlling law, it seems inescapable the trial court properly denied summary judgment and sent the case to trial.

After a non-jury trial, the trial court entered judgment, finding that the regulation did not constitute a taking. In finding no taking had occurred, the trial court accepted the trial testimony of the City's appraiser. The appraiser testified that the island had a fair market value of six times its purchase price when sold for its transferable development rights, and three times its purchase price when sold for recreational use in the Keys' unique recreational market. For each value, the appraiser relied on six comparable sales in the Keys, for a total of twelve comparable sales. Again, the owners presented no evidence addressing the issue of whether a return of six or three times an investment over that extended period was adequate given the time value of money.

A panel of our Court issued an opinion reversing the trial court. Our Court then unanimously agreed to consider this case en banc. Like the panel opinion, the en banc majority opinion reverses the trial court. In reversing the trial court, however, the majority opinion does not challenge or even address the evidence at trial or the trial court's fact-findings. Instead, the majority maintains the trial court erred in denying the property owners' motion for

summary judgment. The trial court erred, the majority opinion contends, because when deciding whether "the regulation wholly eliminated the value of the claimant's land," Lucas, 505 U.S. at 1026, the trial court was prohibited by the Fifth Amendment from considering the value of the property's transferable development rights and the value of the property marketed for recreational use in the state of nature. To reach this result, the majority opinion reverses prior decisions of this Court decided over decades holding the opposite, including two prior decisions involving this case.[18]

**DISCUSSION**

I. **The "value of the parcel as a whole" includes the value of transferable development rights marketed to third parties.**

As held in innumerable takings cases, "our test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property[.]" Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 497 (1987). This formulation has been refined over time. But the focus on value never changed. Contrary to the majority opinion, the only reliable touchstone to determine if a regulatory takings occurred warranting compensation is not a judge's subjective opinion regarding a property's "productive use" but the objective value the property

---

[18] See footnote 2, supra.

commands in a free and competitive market. If the property subject to the regulation provides a reasonable return on investment, as the trial court found here, there can be no taking under the Fifth Amendment.

The takings analysis focuses on "the value of the parcel as a whole." Penn Cent., 438 U.S. at 130 n.27; see also id. at 130–31 (providing that the focus is on the value of "the parcel as a whole"). "'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated." Id. at 130; see also Lucas, 505 U.S. at 1026 (requiring court to determine whether "the regulation wholly eliminated the value of the claimant's land").

The majority opinion evades consideration of "the value of the parcel as a whole." It contends no consideration can be given to the value of the property's transferable development rights. This assertion conflicts with Penn Central. In deciding that no taking occurred in Penn Central, the Supreme Court expressly held that "the transferable development rights afforded appellants by virtue of [their property's] designation as a landmark are valuable[.]" Penn Cent., 438 U.S. at 129 (emphases added). It therefore concluded that the value of the "parcel as a whole" included the value of the property's "transferable development rights" which must be considered when deciding whether a regulation caused a taking. Id. at 137.

55

The majority opinion, however, attempts to limit the holding of <u>Penn Central</u> by interpreting it to prohibit consideration of the value of transferable development rights transferred to third parties. The majority opinion's exclusion of the value provided by sale to third parties is contrary to the near universal judicial understanding of <u>Penn Central</u> that the required consideration of the value of the property as a whole includes the value of transferable development rights marketed to third parties. This understanding is reflected in every judicial decision on this issue.[19]

---

[19] <u>See, e.g.</u>, <u>Pulte Home Corp. v. Montgomery Cnty., Md.</u>, 909 F.3d 685, 696 (4th Cir. 2018) (finding the first <u>Penn Central</u> factor is not sufficiently met to constitute a regulatory taking as, among other things, the purchaser "remains free to sell its unused TDRs [Transferable Development Rights] to another developer for use in another location, allowing it to recoup at least some portion of its twelve million dollar TDR investment"); <u>Sierra Nev. SW Enters., Ltd. v. Douglas Cnty.</u>, 506 F. App'x 663, 666–67 (9th Cir. 2013) (addressing the <u>Penn Central</u> factors and noting that "[e]ven if Defendants' conduct diminished the value of Plaintiffs' TDRs to some extent, the latter two factors preclude a <u>Penn Central</u> claim"); <u>Rector, Wardens, & Members of Vestry of St. Bartholomew's Church v. City of New York</u>, 914 F.2d 348, 359 (2d Cir. 1990) (addressing appellant's offered arguments to distinguish the facts of <u>Penn Central</u> as unavailing and finding "evidence . . . indicat[ing] that the transferrable development rights for the airspace above the Church property are, contrary to [appellant's] claim, not worthless"). <u>See also</u> <u>Glisson v. Alachua Cnty.</u>, 558 So. 2d 1030, 1037 (Fla. 1st DCA 1990) (finding regulations at issue did not constitute a taking of property in part because they "provide a mechanism whereby individual landowners may obtain . . . a transfer of development rights").

This understanding is also reflected in the many state and local laws adopting transferable development rights saleable to third parties. Florida counties that have adopted ordinances reflecting this universal understanding include, but are not limited to, Alachua, Hillsborough, Miami-Dade, Monroe, Orange, and Polk.[20] Florida municipalities that have done so include Coral Gables, Fort Lauderdale, Fort Myers, Key West, Marco Island, Melbourne, Miami, Saint Petersburg, Sarasota, Tampa, and West Palm Beach.[21] Reflected in these laws are the considered reliance of our citizens

---

[20] ALACHUA COUNTY, FLA., ORDINANCES part III, title 40, ch. 402, art. XXIX (2024) (recognizing the sale and transfer of development rights from properties "regulated [for] conservation" or that are "viable agriculture areas" where the county restricted development of these properties); HILLSBOROUGH COUNTY, FLA., LAND DEV. CODE art. V, part 5.07.00 (2024) (recognizing the sale and transfer of development rights from properties that are "environmentally sensitive," "agricultural," or "historic" where the county restricted development of these properties); MIAMI-DADE COUNTY, FLA., ORDINANCES ch. 33B, art. II, div. 3 (2024) (recognizing the sale and transfer of development rights from unimproved land in the East Everglades Area of Critical Environmental Concern where the county restricted development of these properties to preserve their natural state); ORANGE COUNTY, FLA., ORDINANCES ch. 30, art. XIV, div. 3 (2024) (recognizing the sale and transfer of development rights to create greenbelts in neighborhood districts); POLK COUNTY, FLA., LAND DEV. CODE ch. 9, § 914 ("establish[ing] procedures for the transfer of allocated development rights" in the county, and in particular recognizing that "[a]ny development right which is appurtenant to a parcel of land in the [c]ounty . . . which has not been developed may be transferred to any person at any time, to the same extent and in the same manner as any other interest in real property").

[21] CORAL GABLES, FLA., ZONING CODE art. 14, § 14-204 (creating a transfer development rights program recognizing the transfer of a property's

development right where the city restricted the development of the transferring property after designating it historic); FORT LAUDERDALE, FLA., UNIFIED LAND DEV. CODE art. XII (2023) (creating a transfer development rights program that recognizes the sale of a property's development right where the city restricted the development of the selling property after designating it as historic or of archeological significance); FORT MYERS BEACH, FLA., ORDINANCES ch. 34, art. III, div. 3, § 34-632(6) (2023) (recognizing the transfer of development rights from one property to a separate property where the first property's development rights were density restricted); KEY WEST, FLA., ORDINANCES subpart B, ch. 108, art. XI (2023) (creating a transfer development rights program that recognizes the sale of a property's development right where the city restricted the development of the selling property after designating it as a conservation land); MARCO ISLAND, FLA., ORDINANCES ch. 30, art. XV, §§ 30-969, 30-972 (2023) (recognizing the transfer of development rights from one property to another where the city designated the transferring property as a "special treatment" property, thereby restricting the use of these properties due to their "environmental sensitivity and historical and archaeological significance where the essential ecological or cultural value of the land is not adequately protected under the basic zoning district regulations"); MELBOURNE, FLA., ORDINANCES part III, app. B, art. IV, § 4(c) (2023) (recognizing the transfer of development rights from properties where the city restricted development to preserve the Indian River Lagoon to unrestricted properties); MIAMI, FLA., ORDINANCES ch. 23, art. I, § 23-6 (2023) (creating a transfer development rights program that recognizes the sale of a property's development right where the city restricted the development of the selling property after designating it as historic); SAINT PETERSBURG, FLA., ORDINANCES ch. 16, §§ 16.20.160.3, 16.70.040.1.16 (2023) (prohibiting "uses other than preservation" for properties within a "preservation district" and in return, "allow[ing] property owners of designated preservation districts to benefit from the development potential by allowing the sale of the development right"); SARASOTA, FLA., ZONING CODE art. VI, div. 9, § VI-912(c)(5) (2023) (recognizing the sale and transfer of development rights from properties designated historic, where the city limited the development of these properties); TAMPA, FLA., ORDINANCES ch. 27, art. II, div. 6, § 27-141 (2023) (recognizing the sale and transfer of development rights for properties designated historic, where the city restricted the use of these properties); WEST PALM BEACH, FLA., ORDINANCES ch. 94, art. IV, § 94-132 (2023) (creating a transfer development rights program that recognizes the sale of

on the traditional and, until now, universal understanding of <u>Penn Central</u>. The majority opinion's holding would upend this considered reliance in a manner that is breathtaking.

Because our test for regulatory taking focuses on "the value of the parcel as a whole," <u>Penn Cent.</u>, 438 U.S. at 130 n.27, 130-31, no persuasive reason exists for excluding entire categories of value in the manner done by the majority opinion.

The contention that categories of market value should be excluded from the takings analysis is just a variation of the old claim that the property should be severed into discrete strands to decide if a discrete strand of the property has lost value rather than the property as a whole. This severance argument has been routinely rejected as distorting the takings analysis. <u>See, e.g.</u>, <u>Andrus v. Allard</u>, 444 U.S. 51, 65–66 (1979) ("[W]here an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety."). <u>See also</u> <u>Keystone Bituminous Coal</u>, 480 U.S. at 498 ("Many zoning ordinances place limits on the property owner's right to make profitable use of some segments of his property. A requirement that a

---

a property's development right where the city restricted the development of the selling property).

building occupy no more than a specified percentage of the lot on which it is located could be characterized as a taking of the vacant area as readily as the requirement that coal pillars be left in place.").

The only authority the majority offers for its creative revision of Penn Central is a twenty-seven-year-old suggestion by Justice Scalia in his concurrence in Suitum v. Tahoe Regional Planning Agency, 520 U.S. 725 (1997). In his concurrence, Justice Scalia suggested that the value of transferable development rights sold to third parties should not be considered part of the value of a property for purposes of the takings analysis. Id. at 749. He reasoned real estate development rights that are transferable are more like "chits" or "cash payments" than strands of the bundle of sticks that make up real property.

In the first place, this reasoning does not apply in Florida. Under Florida property law, transferable development rights are an interest in real estate and often a very valuable interest. For example, the Florida courts have recognized that the movement of transfer development rights from a sending to a receiving property can wrongfully impair the value of real estate collateral secured by a mortgage on the sending property. Gordon v. Flamingo Holding P'ship, 624 So. 2d 294, 297 (Fla. 3d DCA 1993) (holding that "[a]s a result of the transfer of development rights the collateral for the Mortgage has been

wasted, impaired, and diminished"). Florida law in this regard is in accord with the general understanding that transferable development rights are an interest in real estate while attached to real estate. See, e.g., I.R.S. Priv. Ltr. Rul. 202335002, 2023 WL 5653502 (Sept. 1, 2023) (recognizing transferable development rights sold to third parties as real estate for purposes of like-kind exchanges under federal tax law); Appraisal Institute, Appraisal of Real Estate 76 (14th ed. 2013).

This status under Florida law is determinative because, of course, state, not federal, law defines property.[22] A court respectful of the few and diminishing vestiges of the federalism established by our original Constitution will be careful not to further degrade the authority of the states by creating what amounts to a federal common law of property that undermines "the legitimate and traditional interest which the State has in creating and defining the property interest of its citizens." Aquilino v. United States, 363 U.S. 509, 514 (1960).

---

[22] "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law[.]" Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972); see also Morgan v. Comm'r of Internal Revenue, 309 U.S. 78, 80 (1940) ("State law creates legal interests and rights.").

Moreover, the majority in Suitum firmly declined Justice Scalia's suggestion. It did not limit consideration of transferable development rights to those transferred to other property of the owner of the rights as suggested by Justice Scalia. Instead, the majority in Suitum based its decision (that the takings case was ripe for adjudication) on the very fact that the "salability" of the transferable development rights was established and "there are many potential, lawful buyers for Suitum's [transferable development rights], whose receipt of those rights would unquestionably be approved." 520 U.S. at 741 (emphases added). The majority expressly framed the issue as involving rights marketed to third parties: "[W]hether the claim is ripe for adjudication, even though Suitum has not attempted to sell the development rights she has or is eligible to receive." Id. at 728–29 (emphasis added).[23]

In the twenty-seven years since Suitum was issued, no court has adopted Justice Scalia's suggestion. Instead, courts considering the issue have uniformly held that the concurring opinion in Suitum "underscores the [Supreme] Court's reaffirmation of the Penn Central holding that the value of [transferable development rights] is to be considered to answer the threshold question of whether a taking has occurred." Good v. United States, 39 Fed.

---

[23] This ripeness holding became moot when the Supreme Court subsequently lowered the ripeness standard in Knick v. Township of Scott, Pennsylvania, 588 U.S. 180, 184–85 (2019).

Cl. 81, 108 (1997), aff'd, 189 F.3d 1355 (Fed. Cir. 1999) (using the value at sale of transferable development rights to determine no taking had occurred).

In these circumstances, the majority opinion erred in following the reasoning of a concurring opinion, rather than that of the Suitum majority opinion. See, e.g., Wirt v. Cent. Life Assurance, Co., 613 So. 2d 478, 479 (Fla. 2d DCA 1992) (noting that while a concurring opinion may be persuasive, "it does not provide authority").

II. **The "value of the parcel as a whole" includes the value of the property marketed for recreational use in its natural state where an active, competitive market among private buyers exists for such use.**

The majority opinion also evades consideration of "the value of the parcel as a whole" by excluding the value of the property marketed for recreational purposes in its natural state. In doing so, the majority opinion errs. Whether the sale of a property for recreational use produces meaningful value is not a question of constitutional law, it is a question of fact dependent on supply and demand in the particular market at issue.

Anyone who hunts or fishes knows that the market for land held in its natural state is growing as such land becomes scarcer. To deny this fact is to deny the basic tenet of supply and demand that underlies our free market economy. Indeed, studies have shown that land in its natural state can have

63

substantial monetary value for hunting, fishing, camping, and other nature-oriented uses.[24]

In the Keys' real estate market, with its unique demand for recreational uses, a sale of an offshore island in its natural state for recreational use yields substantial value, according to the undisputed record before us. This should surprise no one familiar with the Florida Keys. The Keys draw visitors from across the globe for fishing, snorkeling, scuba diving, spearfishing, lobstering, kayaking, sailing, motorboating, windsurfing, and wildlife-observing. See, e.g., Fodor's Travel Guides, Fodor's InFocus Florida Keys (8th ed. 2023).

In any event, as an appellate court, we are not free to depart from the facts in the record. See generally Cruz v. State, 320 So. 3d 695, 712 (Fla. 2021) ("[A]s long as the trial court's findings are supported by competent substantial evidence, this Court will not substitute its judgment for that of the trial court on questions of fact, likewise of the credibility of the witnesses as

---

[24] See, e.g., L. Macaulay, The Role of Wild-Life Associated Recreation in Private Land Use and Conservation: Providing the Missing Baseline, 58 LAND USE POLICY 218–33 (2016) ("Approximately 32.7% of the private land in the U.S. (440.1 million acres) is either leased or owned for wildlife-associated recreation. Hunting land is the primary contributor to the land area, accounting for 80.9% (355.9 million acres) of the total, followed by wildlife-watching at 11.3% (49.9 million acres) and fishing at 7.8% (34.3 million acres).").

well as the weight to be given to the evidence by the trial court." (citations and internal quotation marks omitted)).

Nevertheless, the majority opinion elevates this question of fact into an a priori principle of constitutional law. The majority opinion is based on the legal fiction that any value generated from a property in its natural state must be deemed a token amount regardless of its actual market value. This legal fiction finds no support in the text of the Fifth Amendment.

To elevate what would normally be a question of fact to a principle of constitutional law, the majority opinion relies upon a misreading of Lucas. Lucas concerned a South Carolina law barring the owner of two ocean front lots in a residential development surrounded by other homes from building homes on his lots. 505 U.S. at 1008. Under the regulation, the only use for the ocean front lots was recreation overlooked by the adjacent houses. Id. The South Carolina trial court expressly made a fact-finding that in the relevant real estate market, the parcels were rendered "valueless." Based on the state court's factfinding, Lucas held that a regulation that rendered the lots "valueless" in the sense that it "wholly eliminated the value of the claimant's land" was a "categorical" taking. Id. at 1015–18, 1026 (emphases added).

Lucas is easily distinguishable from this case. In Lucas, the state trial court made a factual finding that the lots marketed solely for recreational uses adjacent to lots with residences were rendered "valueless." Here, the state trial court made a factual finding that the offshore island in the Florida Keys when marketed for recreational use had significant value. In Lucas, moreover, the lots had no transferable development rights. Here, the offshore island has transferable development rights that the trial court found have substantial value. In sum, in Lucas the South Carolina trial court found the lots were "valueless" in the South Carolina market; here the Florida trial court found the offshore island had significant value in the Florida Keys market.

But the majority opinion reads Lucas as shifting the focus of takings analysis away from the regulation's impact "on the value of the parcel as a whole." Instead of "value," the majority opinion interprets Lucas as focusing on "productive use." The majority opinion would, in essence, remove the term "value" and insert the term "productive use" in the Supreme Court's classic formulation of the regulatory taking test: "[O]ur test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property[.]" Keystone Bituminous Coal, 480 U.S. at 497. The majority opinion then envisions "productive use" as limited only

66

to physical development and therefore a priori excludes the value of the property used for recreation in its natural state, no matter how profitable. Thus, the majority opinion reasons that because the sale of property for recreational uses does not involve physical development, it does not constitute an "economic use" of property, even though the sale, as here, generates substantial economic value.

It is simply illogical, however, to maintain that a use that generates economic value is not an economic use. A theory of economic use divorced from market value is valueless—worse, it is ultimately subjective. Yet that is the essence of the majority's position. Nothing in the Constitution requires such a counter-intuitive result. The majority opinion's interpretation of Lucas as shifting the takings focus from market value to physical development does not withstand analysis.

It is not a fair reading of Lucas. At every step of its analysis, the Supreme Court in Lucas focused on "value." The Supreme Court framed the issue in Lucas as one of value: "This case requires us to decide whether the Act's dramatic effect on the **economic value** of Lucas's lots accomplished a taking of private property under the Fifth and Fourteenth Amendments requiring the payment of 'just compensation.'" 505 U.S. at 1007 (emphasis added). The Supreme Court framed the holding of Lucas as one of value

based on the trial court's finding that the law at issue rendered the parcels **"valueless."** Id. (emphasis added).

Admittedly, Lucas uses the terms "economic use" and "value" interchangeably. But, as Lucas itself makes clear, "economic use" means a use that generates "value." In this regard, the only way to determine if a use is "economic" is to estimate its "value." The only way to estimate value is to turn to the market and determine sales price. It is extraordinary to suggest, as the majority opinion does, that a sale of property is not an "economic use of property." In any system of free market capitalism, provided there is an active and competitive market as exists here, the sale of property is "the most profitable **use** of [a property owner's] property." Andrus, 444 U.S. at 66 (emphasis added). Therefore, if a recreational use generates economic value when a property is sold in the real estate marketplace, it is an "economic use." The Fifth Amendment does not state otherwise.

Moreover, the Supreme Court has expressly rejected attempts to interpret Lucas as shifting the focus from value to "productive use" in the manner proposed by the majority opinion. First, in Tahoe-Sierra Preservation Council, Inc., the Supreme Court held that "the categorical rule in Lucas was carved out for the 'extraordinary case' in which a regulation permanently deprives property of **all value**[.]" 535 U.S. at 332 (emphasis added). Indeed,

68

in Tahoe-Sierra, even the dissent conceded (what the majority opinion here denies) that "[t]he Court also reads Lucas as being **fundamentally concerned with value**, **rather than with the denial of 'all economically beneficial or productive use of land.'**" Id. at 350 (Rehnquist, J., dissenting) (internal citation omitted and emphasis added).

Again, in Lingle, the Court held that value is the key criteria in a Lucas analysis: "In the Lucas context, of course, the **complete elimination** of a property's **value** is the determinative factor." 544 U.S. at 539 (emphases added). Significantly, in this case, no one contends there was a complete elimination of the island's value.

Citing these cases, other courts have held that the value of a property based upon a sale must be considered because "later Supreme Court cases make clear that, to prevail on a [Lucas] categorical taking claim, the property must lose all value." Robinson v. City of Baton Rouge, No. CV 13-375-JWD-RLB, 2016 WL 6211276, at *40 (M.D. La. Oct. 22, 2016). See also Hawkeye Commodity Promotions, Inc. v. Vilsack, 486 F.3d 430, 441 (8th Cir. 2007); Nammari v. Town of Winfield, No. 2:07-CV-306, 2008 WL 4757334, at *11 (N.D. Ind. Oct. 29, 2008) (noting it was implausible that owner could state categorical taking claim under Lucas because they were able to sell their interest in the subject property).

The cases the majority cites for its misreading of Lucas all involved factual circumstances where a regulation left a property in its natural state but there was also no competitive, private market for the property in its natural state. Properly understood, they hold only that where "government action relegates permissible uses of property to those consistent with leaving the property in its natural state (e.g., nature preserve or public space), **and no competitive market exists for the property without the possibility of development**, a taking may have occurred." Del Monte Dunes at Monterey, Ltd. v. City of Monterey, 95 F.3d 1422, 1433 (9th Cir. 1996), aff'd, 526 U.S. 687 (1999) (emphasis added). These cases are easily distinguishable from the instant case where a competitive, private market exists.

The main case relied upon by the majority opinion, for example, found a Lucas taking in a denial of a permit to fill wetlands. Lost Tree Vill. Corp. v. United States, 787 F.3d 1111, 1113 (Fed. Cir. 2015). In doing so, the court readily acknowledged, what the majority here denies, namely that the Lucas "Court used the term 'use' synonymously with the term 'value.'" Id. at 1115 (quoting Lucas, 505 U.S. at 1019 n.8). Examining the issue of value, it noted that the subject property's "residual environmental value has been reduced by mosquito abatement measures, which left isolated hummocks and stagnant eutrophic pools." Id. at 1117. Critically and perhaps for this reason,

70

"[t]he government did not produce evidence indicating that Lost Tree could sell [the subject property] in such a condition." Id. For this reason, Lost Tree is easily distinguishable from the instant case in which the record reflects a competitive, private market for the island at issue. More importantly, it does not support the majority's "productive use" theory.

In another case cited by the majority for its theory that the takings analysis involves comparison of productive use rather than value, the court held that the trial court committed reversible error in "reason[ing] that value was relevant to but not dispositive of the Lucas inquiry." Bridge Aina Le'a, LLC v. Hawaii Land Use Comm'n, 950 F.3d 610, 628 (9th Cir. 2020). "This was error," the court held, "because, as we have explained, the Supreme Court's precedents underscore that value is determinative." Id. ("Absent more, there is no Lucas liability for this less than total deprivation of value."). Bridge Aina Le'a held that no Lucas taking had occurred. These cases do not support the majority's "productive use" theory.

In sum, the Fifth Amendment does not require the government to compensate for every reduction in value caused by a regulation. This is because every regulation arguably impacts value. If the government had to pay for every regulation, the government could not regulate. At what point then does the Fifth Amendment require compensation? The Fifth

71

Amendment requires compensation when the regulation reduces the value below a reasonable return on investment. Thus, no regulatory taking occurs where the property subject to the regulation retains value sufficient to provide a reasonable return, which is what the trial court found here.

III. **By streamlining the process to declare a taking, the majority opinion will encourage judges at all levels to depart from the appropriate restraint that courts must exercise when asked to review the constitutionality of the acts of the executive and legislature.**

I would be less than candid if I did not admit that I have serious concerns about the majority opinion's impact on "the doctrine of separation of powers, one of the structural pillars upon which American freedoms rest." Detournay v. City of Coral Gables, 127 So. 3d 869, 873 (Fla. 3d DCA 2013).

The majority opinion clears the way for courts to quickly and easily declare laws a "categorical" taking, thereby avoiding the deliberate and fact-intensive approach of Penn Central. Indeed, the majority opinion seems motivated to expedite and streamline the process to declare laws a taking. But does it promote the Constitutional separation of powers to hand every judge the power to override the acts of executive and legislative bodies in a faster, easier, less deliberative way?

I believe courts should always incline to the most restrained, careful, and painstaking approach before declaring a law unconstitutional. I am

72

particularly concerned that the majority opinion uses its quick and easy "categorical" approach to strike down laws that the other branches of government determined were necessary to protect the lives of the residents of the Florida Keys from hurricanes.

The majority opinion will place judges, rather than legislators, at the forefront of certain land use policy. To give one relatively small example, underlying this case are important land-use policy questions such as: how much upland should be required to build a residence on an offshore island in the Florida Keys given their dependence on water quality and hurricane evacuation? The Keys consist of thousands of small islands, most of them undeveloped. Should residences be allowed on islands of ten acres, one acre, a half-acre, a quarter acre, or less? Should residences be allowed on the many privately owned parcels of bay-bottom? The majority opinion essentially declares the requirement of ten acres a taking. In doing so, it will inevitably drag the courts into the role of drawing these lines in disputes regarding any undersized lots. I firmly believe this type of line drawing requires broad input and a constant rebalancing of interests that is outside the competence of judges, no matter how well-intentioned or self-assured.

A wise judge once wrote: "The aggressive judge expands the Court's authority relative to that of other branches of government. The modest judge

tells the Court to think very hard indeed before undertaking to check actions by other branches of government." William H. Pryor, Jr., The Perspective of a Junior Circuit Judge on Judicial Modesty, 60 Fla. L. Rev. 1007, 1012 (Dec. 2008) (citations and quotations omitted). This Court should have taken the path of the modest judge here, recognizing that "legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts." Mo., Kan., & Tex. Ry. Co. of Tex., 194 U.S. at 270 (Holmes, J.).

## CONCLUSION

Because the trial court properly adjudicated this case under well-established law, the trial court should be applauded and affirmed, not reversed. The majority opinion overturns well-established law relied upon by many legislative bodies. It replaces objective criteria like "market value" with subjective criteria like "productive use." Its approach will ultimately prove unworkable. In the meantime, it will tie the hands of legislative bodies and interfere with their ability to enact hurricane and environmental regulations that save lives and shore up property values. I respectfully dissent.